UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
NEWARK DIVISION

| | |
|---|---|
| APRIL HANKINS, EXECUTRIX OF THE ESTATE OF VERNON HANKINS, DECEASED, AND APRIL HANKINS, IN HER OWN RIGHT, <br><br>     Plaintiff, <br><br> v. <br><br> PHILADELPHIA CONTRIBUTIONSHIP INSURANCE COMPANY; J. CLAY KINCAID; CRAWFORD AND COMPANY; JOHN DOE; MARY DOE; ABC BUSINESS ENTITIES AND XYZ CORPORATIONS, <br>    Defendants. | Civil Action No. 2:15-cv-203-JMV-MF <br><br> Hon. John Michael Vazquez, U.S.D.J. <br> Hon. Mark Falk, U.S.M.J. |

---

**AMICUS CURIAE BRIEF ON BEHALF OF THE
ASSOCIATION OF CLAIMS PROFESSIONALS
SUPPORTING RECONSIDERATION OF THE DECISION
DENYING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT**

---

**TOMPKINS, McGUIRE,
WACHENFELD & BARRY, LLP**
3 Becker Farm Road, Suite 402
Roseland, New Jersey 07068
Phone: (973) 622-3000
Harry D. McEnroe
Attorneys for Amicus Curiae,
Association of Claims Professionals

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION** ................................................................................................1

**LEGAL ARGUMENT**..........................................................................................2

**IMPOSITION OF A LIMITED DUTY OF CARE TO RESPONDING
FIELD CLAIMS ADJUSTERS IS CONTRARY TO PUBLIC POLICY** .........................2

    **A. New Jersey Supreme Court Duty/Public
       Policy Analysis** ....................................................................................3

    **B. Other Jurisdictions' Policy Analyses of
       Independent Adjuster Role**...............................................................9

    **C. Practical Realities Militate Against Imposition
       of Such A Duty** ................................................................................14

i

## TABLE OF AUTHORITIES

Page(s)

Cases

Butler v. Acme Markets, Inc., 89 N.J. 270, 274-75 (1982) ....................................................6

Charleston Dry Cleaners & Laundry, Inc. v. Zurich American Ins. Co.,
    556 S.E. 2d 580, 588-89 (S. Car. 2003) .........................................................................11

De Dios v. Indemnity Insurance Co. of North America,
    927 N.W. 2d. 611 (Iowa 2019) ....................................................................................12

Estate of Desir ex rel. Estiverne v. Vertrus, 214 N.J. 303 (2013) ...........................................3

Fedway Associates, Inc. v. Engle Martin & Associates, Inc.,
    2019 WL 4894546 (App. Div. 2019) ..............................................................................9

Hamill v. Pawtucket Mut. Ins. Co., 892 A. 2d 226 (Vt. 2005)...............................................10

Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439
    (citing Goldberg v. Housing Auth., 38 N.J. 578, 583 (1962)) ...................................3

Kelly v. Guinnell, 96 N.J. 538, 540 (1984), ...................................................................6

Krauss v. Greenberg, 137 F. 2d 569, 571 (3d Cir. 1943). ............................................9

Lodholtz v. York Risk Services Group, 778 F. 3d 635, 641 n. 11 (7th Cir. 2015) ...................9,10

McKenna v. Pacific Rail Service, 32 F. 3d 820, 825 (3d Cir. 1994) ..............................9

Morvay v. Hanover, 506 A.2d. 333 (N.H. 1986). .........................................................12

Natividad v. Alexis, Inc., 875 S.W. 2d 695 (1994) ...................................................11

Norfolk Southern Ry Co. v. Basell USA Inc., 512 F. 3d 86, 92 (3d Cir. 2008) ............................9

Sanchez v. Lindsey Morden Claims Servs., Inc.,
    72 Cal. App. 4th 249 (1999)................................................................................12

Trinity Baptist Church v. Brotherhood Mutual Ins. Services, LLC,
    341 P. 3d 75 (Okla. 2014) ...............................................................................11

References                                                                        Page(s)

New Jersey Public Adjuster Association, "What is a Public Adjuster,"
available at  https://www.njpaa.net/what-is-a-public-adjuster/;  ................................................2

N.J.SA. 17:22B-2 (defining public adjuster) ...................................................................2

## **INTRODUCTION**

The Association of Claims Professionals ("ACP") appreciates the opportunity to submit this amicus brief, as this case is of vital interest to our organization and its members. The company members of ACP include the leading national independent claims adjusters, performing both claims-adjusting and third-party administrator services. ACP believes that presenting its position will highlight the potential impact of the Court's decision, as well as the flaws in its reasoning. This opinion represents an extension of a duty of care with respect to independent field adjusters, an important issue not yet considered by any New Jersey court. ACP can offer its perspective on the applicable duty analysis, the role of such adjusters, and the public policy concerns which should predominate any meaningful reconsideration of the Court's ruling.

ACP (formerly known as the American Association of Independent Claims Professionals or AAICP) was formed in 2002 as the only national association representing the interests of the nation's independent claims professionals. ACP members employ thousands of claims specialists and other professionals across the country and handle millions of property and casualty, workers' compensation, disability, and other liability claims annually. Membership is comprised of independent claims adjusters and third-party administrator organizations, many of whom handle claims administration responsibilities for New Jersey carriers and self-insureds. As the national voice of the independent claims adjusting industry, ACP has worked on the development of federal and state solutions to enhance quality and ensure prompt and equitable reimbursement of claims to insureds.

ACP companies respond every day on behalf of their principals – insurers and self-insured employers -- to individuals and businesses who receive employee benefits or suffer a loss such as workplace injury, first or third party property or casualty damage, or liability. Insurance carriers

and self-insured companies retain our member companies for expert advice and knowledge throughout the management of claims entrusted to their care. ACP companies provide a full range of claims services, from claims adjusting to comprehensive claims management. ACP focuses on the importance of claims specialists as frontline responders when an individual or business suffers a loss.

Importantly, ACP only represents "independent adjusters" like defendant J. Clay Kincaid, who worked for defendant Crawford and Company here; ACP does not represent "public adjusters" – individuals retained by policyholders for purposes of representing the policyholder (like the Hankins here) in their claims against insurers.

> "A public adjuster is an insurance claim adjuster who advocates for the Policyholder during first party insurance claims. Public Insurance Adjusters are the only professional, besides an Attorney or 'broker of record', that may legally represent Policyholders. Public Adjusters in the State of New Jersey are licensed by the New Jersey State Department of Banking and Insurance. Typically, and specifically permitted under State Law, Public Adjusters get paid on a contingency basis, allowing Policyholders to retain representation without a fee until Insurance benefits are received."

See New Jersey Public Adjuster Association, "What is a Public Adjuster," available at https://www.njpaa.net/what-is-a-public-adjuster/; see also N.J.SA. 17:22B-2 (defining public adjuster).

## LEGAL ARGUMENT

### IMPOSITION OF A LIMITED DUTY OF CARE TO RESPONDING FIELD CLAIMS ADJUSTERS IS CONTRARY TO PUBLIC POLICY

In prior submissions, the parties have scrutinized the four factors recognized in New Jersey which are to be identified, weighed and balanced before the imposition of a duty of care "satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public

policy." Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (citing Goldberg v. Housing Auth.,
38 N.J. 578, 583 (1962)).  It is the final factor, focusing upon the public interest attendant the
imposition of the "limited duty" upon field claims adjusters, described in the Court's February 25,
2020 Opinion, which has drawn the attention and concern of ACP.

### A.    New Jersey Supreme Court Duty/Public Policy Analysis

The public policy issues generated by an application of a tort duty of care vary greatly,
depending upon the presented context.  Two New Jersey Supreme Court cases are most illustrative.
The seminal Hopkins decision focused upon the policy concerns evolving from "the role and
responsibility of a [real estate] broker in conducting an open-house inspection of a residence."
Hopkins, supra, 132 N.J. at 439.  In Estate of Desir ex rel. Estiverne v. Vertrus, 214 N.J. 303
(2013), the court was confronted with unique circumstance of a neighbor requesting help from the
decedent with respect to a possible robbery in progress.  In each case the courts discussed at length
the public interest, supportive of a limited duty finding in Hopkins, and indicative of the lack of
duty within the tragic circumstances of Estate of Desir.

The analytical framework of the Hopkins decision, focused upon the "role and
responsibility" of a hosting real estate broker, can be readily applied to that of a field claims
adjuster responding to a catastrophe claim.  In performing this duty test within the circumstances
presented, the Hopkins court noted: "Certain common aspects of the broker's trade in this context
can be identified." Id. at 439.  A similar study of the field claims adjuster's function must be
undertaken to gauge the impact of the establishment of such a limited duty.  While the Hopkins
analysis resulted in the finding of a limited duty for such brokers to inspect and warn under certain
circumscribed conditions, a similar inquiry here demonstrates the inequity of the Court's ruling.

With respect to an open-house, the court scrutinized the nature of the relationship between the broker and the customer/plaintiff; finding it to be "substantial" in this setting. Id. at 441. The broker's "very tangible economic benefits" from this relationship, including those extending beyond the sale of the property, were also noted. Id. at 440-41. In light of such conditions, the Hopkins court determined that "implicit in the broker's invitation to customers is some commensurate degree of responsibility for their safety while visiting the premises." Id. at 441.

By way of contrast, the brief, transactional contact between the claimant and an independent field claims adjuster appraising property damage on behalf of an insurance carrier hardly constitutes a relationship, let alone one of a substantive nature. Unlike the real estate broker, there is no hosting involved. The adjuster's only significant relationship is with the retaining carrier. Such independent adjusters are regulated by the customs and practices of the insurer. They are predominantly salaried professionals who are not compensated by the number of claims handled. Accordingly, there are none of direct economic benefits to these adjusters that inure to commission – based real estate brokers running open houses. In contrast, "public adjusters" are engaged by the policyholder to represent him or her on their claim, and such public adjusters presumably have a duty to their principle, such as the Hankins here.

Considered as the "key to the broker-customer relationship," by Hopkins, giving rise to the limited duty imposed, was the "services that are offered by the broker and expected by the customer in the context of an open-house inspection of property." Id. at 444. The decision explored those varied services in detail. Id. at 439-444. The opportunity for the broker to meet and cultivate future clients was also noted. Id. at 441. The function of an independent property loss field claims adjuster, responding to an insured's home post-loss, is straightforward. There are no future benefits to be derived by the investigation of a property loss. The essential function of

an adjuster is investigatory. The focus is ascertaining the values of the loss, with the role purely secondary, as subject to the insurer's approval. Of course, if Mr. Hankins wanted representation or advice, he could have retained a public adjuster for that purpose.

In light of the role and varied responsibilities of the real estate broker conducting an open-house, and the economic benefits gained therefrom, digested at length within the decision, the Hopkins court was "satisfied that the public interest is served by recognizing a duty of care on the part of brokers." Id. at 448. The duty found was expressly limited in scope. Id. at 448-49. The decision's broader intent was "to ensure that the application of negligence doctrine does not unnecessarily or arbitrarily foreclose redress based on formalities or technicalities." Id. at 448.

The societal impact of an imposition of a duty of care, and its consequent rejection, was the focus of the New Jersey Supreme Court's decision in Estate of Desir. In Desir, the defendant left his apartment/business location when he suspected a robbery was in progress and sought assistance from a neighbor. Id. at 310. After calling the apartment and not receiving an answer, the neighbor went to the location and was killed by the intruder. Id. at 310-11. An action on behalf of the estate of the assisting neighbor was brought against the owner of the business premises. Concluding that general principles of premises liability and the rescue doctrine provided no cause of action, the court then engaged in the "traditional, comprehensive analysis of whether a duty is owed," as previously articulated in Hopkins. Id. at 322. In so doing, the court focused primarily upon policy concerns which tempered consideration of any duty extension.

Prior to considering the fundamental factors involved in this analysis, Desir stressed the "guiding principle" from Hopkins, that the wider community impact of inflicting a duty in a particular case must be recognized. Id. at 322-23.

> That point bears repeating here because the function of the common law is not to achieve a result in a particular case, but to establish generally applicable rules to govern societal behaviors. Craft a rule that is inherently fact-specific and we risk creating an outcome that reaches only the particular circumstances and parties before the Court today; create a broadly worded duty and we run the risk of unintentionally imposing liability situations beyond the parameters we now face.

Id. at 323.

The Desir decision's review of the four-factor duty test also informs the analysis herein. In terms of the parties' relationship, the inability to "identify the relationship between the parties with great precision" was viewed as problematic. Id. This dilemma was noted to have been absent from earlier duty analyses conducted by the court in Hopkins, and also the relationship between a social host and invited party guest in Kelly v. Guinnell, 96 N.J. 538, 540 (1984), as well as the grocery store owner and patron in Butler v. Acme Markets, Inc., 89 N.J. 270, 274-75 (1982). Id. at 323.

The relationship at bar is similarly muddled. The field property adjuster's primary connection is with the assigning carrier or third-party administrator, rather than the insured. Moreover, where further communication needs arise, or in the event of a dispute with the damages appraisal, property owners interact with carrier claim representatives, not the on-scene adjuster. Property owners can also, and regularly do, retain their own adjusters – public adjusters. Desir lamented this lack of a "clear or single relationship that we can identify to which this proposed duty would attach or in which it would be binding." Id. In its February 25 Opinion, the Court somehow concluded that the adjuster's role was "to help" the insureds and that a "position of trust" existed. This description is accurate – but only for public adjusters. It is far afield from the actual dynamic for the type of adjuster that is at issue here – an independent adjuster.

6

The lack of clarity concerning the "nature of the attendant risk" factor was also identified as starkly contrasting with that of these prior duty-finding decisions. <u>Desir</u> noted the variable risks involved therein, in contrast to where these were "always reasonably well-defined" in <u>Kelly</u> (that the party guest would drink to excess and then drive), 96 N.J. at 548, <u>Hopkins</u> (that the open house attendee would be impaired while walking through the premises), 132 N.J. at 443, and <u>Butler</u>, (that the store patron would be mugged in the parking lot), 89 N.J. at 274-75. <u>Id</u>. at 323-24. With respect to the <u>Desir</u> defendant, and applicable to the on-site independent adjuster herein, the court emphasized:

> the actual information that he had concerning the attendant risk is vague and diffuse, offering a poor basis on which to attempt to craft a generally applicable rule in tort.

<u>Id</u>. at 329.   As noted in defendants' prior submissions, the hazardous condition that eventually caused decedent's death herein did not even exist at the time of the adjuster's inspection.

<u>Desir</u> further recognized that consideration of the "opportunity and ability to exercise care" usually arose in far more confined circumstances. <u>Id</u>. at 324. This was viewed as particularly ill-defined in that context, since "it is not especially clear what opportunity or ability is being considered." <u>Id</u>. at 324. As the court emphasized:

> Unlike our early decisions analyzing the imposition of a duty, the varying ways in which one might define the opportunity and ability to avoid harm in this matter make it so unlike the well-defined scenarios that we have previously considered as to make identification of the duty impossible.

<u>Id</u>. at 324. Again, the scenario under review, with the eventual source of harm not yet created by others, was anything but "well-defined."

The role of the on-scene independent property claims adjuster post-catastrophe in relation to the insured is more akin to the property/business owner in <u>Desir</u> than the defendants in the duty-

7

finding case law reviewed therein, or the public adjuster that insureds often retain.  Following the investigation of the loss, the independent adjuster's interaction with the claimant is relatively brief and transactional, with ultimate disposition of the appraisal subject to further review.

It is in relation to consideration of the public interest factor where <u>Desir</u> provides its most cogent and applicable authority.  When this rationale is examined within the subject context, it becomes apparent that the Court's imposition of a "limited" duty, holding the adjuster conceivably liable for this tragedy, does not serve any public policy interest.

The Supreme Court emphasized that this "evaluation of the public interest" was the true focus of any potential expansion of a duty in tort.  <u>Id</u>. at 328 (citing <u>Hopkins</u>, <u>supra</u>, 132 N.J. at 439).  In assessing this interest, "how establishing this duty will work in practice" was viewed as paramount.  <u>Id</u>. Recognizing the unfortunate circumstances and the sympathy generated by the claim, considerations equally applicable herein, the <u>Desir</u> court found no basis upon which to impose a tort duty on the defendant.  <u>Id</u>. at 329.   As the court concluded:

> Rather, the function of tort law is deterrence and compensation, and <u>absent circumstances in which the definition of the duty can be applied both generally and justly, this Court should stay its hand</u>.  In the end, although creating a cause of action to suit these facts might serve the ends of these particular plaintiffs, we cannot say that it would advance the public interest or lead to a rule that would sensibly, predictably, and fairly govern future conduct.

<u>Id</u>. at 330. (emphasis added).  Wide and fair application of the subject limited duty upon on-scene independent adjusters would appear to be an unachievable in practice.

A thoughtful application of the duty analysis, as exemplified by the foregoing decisions, particularly their joint emphasis on public policy considerations, demonstrates the inequity of finding a vague "limited duty" herein.  The analysis is a far better fit for the public adjuster who is available for hire by the insured, and who has the duty described in the opinion.  There is no

concern that an insured is left without redress.  Finding a duty of care within this context of this case, particularly when a (public) adjuster was available to the insured, is foreign to concepts of fairness.

**B.      Other Jurisdictions' Policy Analyses of Independent Adjuster Role**

It is undisputed that neither the New Jersey Supreme Court nor the Appellate Division has ruled upon the validity of a negligence claim by a property owner against an independent insurance adjuster hired by that insured's insurance company.[1]  In such a situation, a reviewing federal court must predict how the New Jersey Supreme Court would determine the issue.  In fact, the court's obligation is "to apply state law as we find it in the state decisions irrespective of what we may regard as its merits."  Krauss v. Greenberg, 137 F. 2d 569, 571 (3d Cir. 1943).  See also McKenna v. Pacific Rail Service, 32 F. 3d 820, 825 (3d Cir. 1994).  Among the available sources of guidance are decisions of state intermediate appellate courts, of federal court's interpreting New Jersey law, and of other state supreme courts which have addressed the issue.  Norfolk Southern Ry Co. v. Basell USA Inc., 512 F. 3d 86, 92 (3d Cir. 2008) (citation omitted).  Additional direction can be gleamed from "analogous decision, considered dicta, scholarly works, and any other reliable data

---

[1] Indeed, as the New Jersey Appellate Division recently noted in Fedway Associates, Inc. v. Engle Martin & Associates, Inc., 2019 WL 4894546 (App. Div. 2019):

> [N]either this court nor our Supreme Court has addressed the question of whether an independent insurance adjuster owes a duty of care to an insured with regard to the adjustment of a insured's claim. The majority of the courts that have addressed this issue have concluded that an independent insurance adjuster does not owe such a duty to the insured. See Lodholtz v. York Risk Services Group, 778 F. 3d 635, 641 n. 11 (7th Cir. 2015).

tending convincingly to show how the highest court in the state would decide the issue at hand."
Id.

While the Hopkins and Desir decisions provide a template of how the general duty analysis
would be performed by the New Jersey Supreme Court, decisions from other jurisdictions within
this actual context offer compelling guidance.  As noted, the majority of jurisdictions have ruled
that an insurer's independent outside adjuster cannot be held separately liable for his/her own
negligence. Lodholtz v. York Risk Services Group, supra, 778 F. 3d at 641 n. 11 (collecting cases
and noting that only Alaska and New Hampshire have held otherwise).  Several state supreme
courts have so concluded, with  a number focusing upon public policy considerations.

In Hamill v. Pawtucket Mut. Ins. Co., 892 A. 2d 226 (Vt. 2005), the Supreme Court of
Vermont considered whether an insured whose residence suffered water damage and mold growth
had a cause of action in negligence against the independent adjuster who had investigated the
initial claim.  In adopting the majority view, finding a lack of a cognizable legal duty, the court
reviewed the supportive reasoning in detail.   Initially, Hamill noted the respective contracts
involved, the policy itself, defining the insured/insurer relationship, and the contract between the
adjuster and the insurer, establishing an agency situation.  Id. at 256.  The court emphasized that
insureds could institute breach-of-contract and bad-faith claims against their insurer for allegedly
mishandled claims.  Id. at 257.  As the court added:

> Therefore, in most cases, imposing tort liability on independent
> adjusters would create a redundancy unjustified by the inevitable
> costs that eventually would be passed on to insureds.

Id.

Further policy reasons found supportive of the lack of a duty included avoidance of the
creation of "conflicting loyalties" with respect to an adjuster's carrier contractual obligations,

arising out of potential tort liability to insureds, since insureds and carriers often dispute claim values. Id. A further concern was the adjuster's potential limitless liability. Id. While insurance carriers can define and limit their risks, while setting premiums accordingly, adjusters cannot so circumscribe their possible exposure. Id.

The South Carolina Supreme Court also declined "to recognize a general duty of due care from an independent insurance adjuster or insurance adjusting company to the insured" in Charleston Dry Cleaners & Laundry, Inc. v. Zurich American Ins. Co., 556 S.E. 2d 580, 588-89 (S. Car. 2003). This court emphasized that in terms of a source of recovery, the acts of the adjuster/agent may be imputed to the insurer/principal within the context of a bad faith claim. Id. at 589. A similar rationale was employed by the Supreme Court of Texas in Natividad v. Alexis, Inc., 875 S.W. 2d 695 (1994), in finding no need to extend the carrier's duty of good faith and fair dealing to its agents or contractors. Noting the ultimate liability of insurance carriers, the court stated: "The insurance companies must answer for the 'sins' of their agents." Id. at 702, n. 7.

In Trinity Baptist Church v. Brotherhood Mutual Ins. Services, LLC, 341 P. 3d 75 (Okla. 2014), the Oklahoma Supreme Court adopted the majority position. This court also noted the carrier's primary accountability, with the existence of a separate legal duty for adjusters allowing "for potential double recovery." Id. at 86. Trinity Baptist also acknowledged the "irreconcilable conflict" created for an adjuster owning a separate duty to the insured, along with the contractual duty to the carrier. Id. at 85. With respect to the public policy predicament presented by imposing a duty, the court added:

> Even if harm to the insured through an adjuster's negligence might be foreseeable to the adjuster, from a policy standpoint it makes little sense to hold that the adjuster has an independent duty when the insurer itself is subject to liability for the adjuster's mishandling of claims in actions alleging breach of contract and bad faith.

Id. at 86.  Citing the majority view, the Supreme Court of Iowa declined to recognize a claim against a third-party claims administrator for bad-faith failure to pay workers' compensation benefits.  See De Dios v. Indemnity Insurance Co. of North America, 927 N.W. 2d. 611 (Iowa 2019).[2]

The seminal case in this area, cited by virtually all subsequent opinions, is an appellate decision from California, Sanchez v. Lindsey Morden Claims Services, 72 Cal. App. 4th 249 (1999).  The Hamill court largely adopted its rationale, which readily applies to the instant matter. Sanchez arose out of a failure of an independent adjuster to pay a nominal claim related to a vitally needed dryer in a timely manner.  This delay led to a customer of the insured obtaining a judgment for $1.325 million.  In soundly rejecting the imposition of such a duty, this case explored in detail the dominant policy concerns governing whether a separate duty of care should be imposed upon an independent adjuster engaged by an insurer.  The decision relied upon the analogous "expanded policy analysis" conducted in an earlier decision regarding a claim against auditors by investors who bought stock relying on negligently prepared financial reports.  Id. at 252.

With respect to the adjuster's role, the court correctly viewed it as secondary, subject to the control of the insurer, which has the ultimate power over claim handling.  Id. at 253.  Sanchez also noted that while insurer liability is restricted by the policy content, an adjuster has no contract with the insured, and accordingly would be exposed to greater liability than his principal if such a duty of care was imposed.  Id.  The emergence of conflicts between the duty already owed to a

---

[2] The only state supreme court which offered a contrary view was that of New Hampshire in Morvay v. Hanover, 506 A.2d. 333 (N.H. 1986).  After a residential fire claim was denied by the insurer, the claimants sued the carrier's independent investigator who had reported the fire as suspicious.  The court viewed the insured as a "foreseeably affected third-party" to whom investigators owe a duty, along with the carrier, "to conduct a fair and reasonable investigation of an insurance claim."  Id. at 335.

retaining carrier, and any new duty to an insured, was viewed as interfering with faithful performance, thus reflective of "poor policy." Id.

Other policy considerations evaluated by Sanchez were the minimal deterrent effect and the redundancy of potential recovery sources by claimants. Id. at 253-54. Indeed, adjuster's livelihoods were viewed as already at risk due to the hiring carrier's liability for their acts or omissions, in the absence of any proposed duty of care. Id. Inevitable higher premium costs were considered another likely result of a new duty of care, as adjusters would seek to buy insurance against this liability, thus adding expenses to their fees. Id. at 254. Insurers would be expected to add these costs to the charged premiums. Id. According to Sanchez, another dire result would be large litigation or transactional costs flowing from the imposition of a new duty. Id. at 255. Indeed, while carrier duties to insureds have generated extensive litigation, "adjuster liability" law would have to be developed anew. Id.

As Sanchez summarized the core policy concerns militating against imposing such a duty:

> Insurance is a highly uncertain and risky endeavor, because it requires accurate predictions about the occurrence and cost of future events. . . . If adjusters faced negligence liability to insureds, market forces would tend to drive adjusting activities in house, where they could be shielded with contractual exclusions, disclaimers, and limitations. Thus, imposing a duty would reduce, perhaps severely, the offering of independent adjuster services. Yet widespread market acceptance has shown these services to be useful and desirable.

Id. at 254. (emphasis added). In short, this court considered enforcement of a duty upon such adjusters as a virtual death knell for these services.

## C.   Practical Realities Militate Against Imposition of Such A Duty

Independent claims adjusters currently handle approximately thirty percent of the nation's insurance claims, representing over $150 billion of annual claims payments. Carriers rely on independent adjusters to resolve claims as they arise in a timely and effective manner.

The court herein placed great weight upon the communication alleged to have been made by the adjuster with respect to the hole left by the fallen tree. It was the purportedly negligent nature of the related advice that gave rise to the "limited duty" envisioned. The creation of an independent duty for adjusters in such a scenario, beyond that already owed by the retaining insurance carrier, would have a chilling effect on adjuster/insured interactions.

Indeed, the fear of conveying any information that could be construed as instructional, would bring open communications between a field claims adjuster and an insured to a standstill. Unnerved by potential legal repercussions, such adjusters would grow silent. Confusion and uncertainty would ensue, all further burdening the often-tense process of a property damage investigation and evaluation. Delays in resolving claims would also inevitably result.

The imposition of such an obligation, apparently "to not give advice in a negligent manner" (opinion at 11) would be impractical. Inherent in the adjuster's role, as on-site representative of the insurer, is a discussion the nature of the damages, including the appraised loss and potential repair. The contemplated duty, however "limited," would inhibit the robust exchange of information necessary to conduct a meaningful property damage appraisal. Moreover, no deterrent effect would be achieved, as the creation of a new duty would not likely alter adjuster conduct. In fact, virtually every client for whom an independent adjuster acts requires the adjuster to indemnify the carrier for any adjuster acts or omissions, whether on-site or otherwise. In practice, the

independent adjuster bears ultimate responsibility to his or her principal – the insurer or self-insured entity.

Distinguishing between "affirmative advice" and general statements relating to the appraisal/recovery process would be baffling. Even the most nebulous of comments could give rise to liability. And of course the insured is able at any time (on a contingent basis) to procure the services of their own, public, adjuster. ACP, the collective voice of the claims adjusting field, submits that the extension of an independent duty of care, even of a limited nature, into such on-site claims investigations would wreak havoc in its industry, lead to higher premiums, and provide no missing remedies to such claimants.

Thank you for your consideration.

Respectfully submitted,

**TOMPKINS, McGUIRE, WACHENFELD & BARRY, LLP**
Harry D. McEnroe

By: _____
Attorneys for Amicus Curiae,
Association of Claims Professionals

1114226

15